MARÍA LUISA SILVA GONZÁLEZ, por sí y como madre de su menor hijo, Alfredo Juan Martínez y Silva, demandante y apelada, *v.* VÍCTOR ANTONIO CARBONELL Y PÉREZ, demandado y apelante.

No. 3359.—*Visto:* Diciembre 23, 1924. *Resuelto:* Marzo 26, 1926.

1. APELACIÓN Y ERROR—REVISIÓN—PROCEDIMIENTOS Y CUESTIONES INTERLOCUTORIAS, COLATERALES Y SUPLEMENTARIAS—CUESTIONES EN CUANTO A LA INHABILITACIÓN DEL JUEZ INFERIOR—PREJUICIO.—Presentada en apelación la cuestión del prejuicio del juez inferior como base para su inhibición, y analizados los autos en relación con la misma, *se resolvió:* que no se cometió ninguna injusticia contra el demandado durante el juicio.

2. EVIDENCIA — PRUEBA DOCUMENTAL — ACTOS PÚBLICOS U OFICIALES, PROCEDIMIENTOS, RECORDS Y CERTIFICADOS—CERTIFICACIÓN DE MATRIMONIO.—Una certificación de matrimonio que no representa ser un extracto del asiento de inscripción verificado en el registro civil sino una copia íntegra de dicho asiento es admisible en evidencia.

3. EVIDENCIA — PRUEBA DOCUMENTAL — ACTOS PÚBLICOS U OFICIALES, PROCEDIMIENTOS, RECORDS Y CERTIFICADOS—CERTIFICADO DE SERVICIO MILITAR.—Un certificado del servicio militar prestado por una persona en la Guardia Nacional de Puerto Rico, y firmado por el Ayudante General de dicho cuerpo militar, es, en principio, admisible en evidencia aún a falta de cualquier disposición legislativa local.

4. EVIDENCIA—CONOCIMIENTO JUDICIAL—DOCUMENTOS DE LOS DEPARTAMENTOS DEL GOBIERNO FEDERAL — CERTIFICADOS DE RECORDS DEL DEPARTAMENTO DE LA GUERRA — CUSTODIA Y AUTORIDAD DEL OFICIAL QUE CERTIFICA. — Cualquier facultad estatutoria para tomar conocimiento judicial que pueda ser exigida al tratar de documentos comprendidos en la subdivisión 9, sección 69 de la Ley de Evidencia, se infiere necesariamente del claro precepto de la misma ley.

5. APELACIÓN Y ERROR—REVISIÓN—ERRORES NO PERJUDICIALES—ADMISIÓN INDEBIDA DE PRUEBAS—HECHOS QUE HAN QUEDADO PROBADOS POR OTRA EVIDENCIA.—El error, de existir, en admitir prueba de hechos que han sido establecidos por otra prueba a la cual no se ha objetado, no es perjudicial.

6. DAÑOS Y PERJUICIOS — MEDIDA DE LOS DAÑOS — DAÑOS A LA PERSONA — ELEMENTO EN LA MEDIDA DE LOS DAÑOS.—En acción de daños y perjuicios provenientes de la muerte de un capitán de la Guardia Nacional de Puerto Rico que se alega causada por el acto ilegal del demandado, una comisión de Capitán en el Cuerpo de Reserva de Oficiales es un factor que puede omitirse como elemento en la medida de los daños y perjuicios.

7. APELACIÓN Y ERROR—REVISIÓN—ERRORES NO PERJUDICIALES—ERRORES QUE NO AFECTAN AL RESULTADO DEL CASO.—No se revocará una sentencia por meros errores técnicos en la admisión de prueba cuando aparece fuera de toda duda razonable que su exclusión no hubiera afectado al resultado del caso.

8. DESCENDENCIA Y DISTRIBUCIÓN—DERECHOS Y RESPONSABILIDADES DE HEREDEROS Y ''DISTRIBUTEES''—NATURALEZA Y ESTABLECIMIENTO DE LOS DERECHOS EN GENERAL—ACCIONES EJERCITADAS POR HEREDEROS — ACCIONES POR MUERTE CAUSADAS POR EL ACTO ILEGAL DE OTRO—EVIDENCIA—PRUEBA DEL CARÁCTER

DE HEREDEROS.—En acción de daños y perjuicios, por muerte causada por el acto ilegal de otro, ejercitada por los herederos en su calidad de tal, los demandantes pueden justificar su carácter o calidad de herederos en el juicio sin necesidad de acudir al procedimiento para ello establecido por la ley de Procedimientos Legales Especiales.

9. APELACIÓN Y ERROR—ALEGATOS—CUESTIONES LEVANTADAS SIN HACERSE REFERENCIA AL RECORD—CUESTIONES SOBRE LA ADMISIÓN O EXCLUSIÓN DE PRUEBA.—Alegado en apelación que cierta prueba fué admitida no obstante objeción habiéndose tomado excepciones a las resoluciones admitiéndola, pero sin hacerse referencia a alguna página o parte de la transcripción en que aparece la cuestión, tal omisión es por sí suficiente para no considerar la cuestión que de tal modo se levanta.

10. APELACIÓN Y ERROR—PRESENTACIÓN Y RESERVA EN LA CORTE INFERIOR DE LOS FUNDAMENTOS DE REVISIÓN—"ISSUES" Y CUESTIONES EN LA CORTE INFERIOR—CUESTIONES A LAS QUE NO SE HA HECHO REFERENCIA EN EL TRIBUNAL INFERIOR—EFECTO.—Cuando además de objetarse a la admisión de pruebas tardíamente no se hace entonces referencia a alguna cuestión de incongruencia entre la demanda y la prueba, o a que existió sorpresa o que se indujo a la parte, con ello, a error en su perjuicio, tales cuestiones no pueden ser levantadas por vez primera en apelación.

11.—APELACIÓN Y ERROR—REVISIÓN—PARTES CON DERECHO A ALEGAR ERROR—PARTES QUE NO PUEDEN ALEGARLOS—ERRORES DEBIDOS AL PROPIO APELANTE.—Un alegado error que, de existir, se debió al apelante, no puede alegarse en apelación como fundamento para la revocación.

12.—APELACIÓN Y ERROR—ALEGATOS—DISCUSIÓN DE ERRORES—GENERALIDAD EN LA EXPOSICIÓN Y CONCLUSIÓN DEL RAZONAMIENTO—OMISIÓN DE REFERIR LA PARTE DEL RECORD RELACIONADO CON EL ERROR Y EFECTO.—Cuando al discutirse un alegado error hay tal generalidad en la exposición y conclusión del mismo y no existe un razonamiento o referencia a las partes pertinentes de la transcripción relacionados con el mismo, el Supremo no viene obligado a escudriñar los autos en busca de los datos con el fin de basar en ellos la revocación.

SENTENCIA de *Angel Acosta,* J. (Mayagüez) condenando al demandado a pagar cierta cantidad en pleito sobre daños y perjuicios, con costas. *Confirmada.*

*Rafael Rivera Zayas,* abogado del apelante; *Pascasio Fajardo Martínez,* abogado de la apelada.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

El demandado apela de una sentencia dictada en una acción establecida de acuerdo con el artículo 61 del Código de Enjuiciamiento Civil por daños y perjuicios provenientes de la muerte del Capitán Alfredo Dimas Martínez que se alega fué causada por el acto ilegal del demandado.

El apelante en su alegato alega haberse cometido los siguientes errores:

"1ro. La corte erró al declarar sin lugar la moción de inhibición presentada por el demandado.

"2do. La corte erró al admitir el documento suscrito por el encargado del Registro Civil de Cabo Rojo, en el cual hace constar ciertos particulares relativos al matrimonio de Alfredo Dimas Martínez y Doña María Luisa Silva.

"3ro. La corte erró al admitir un certificado firmado por John A. Wilson, Ayudante General de la Guardia Nacional de Puerto Rico, sobre el nombramiento para oficial de la Guardia Nacional recaído en Alfredo D. Martínez, sobre los servicios prestados por éste y su estado de salud.

"4to. La corte erró al admitir un documento procedente del Gobierno de Washington relativo al nombramiento de Alfredo D. Martínez para oficial de la Reserva.

"5to. La corte erró al admitir prueba testifical y documental para determinar el carácter de herederos de los demandantes.

"6to. La corte erró al admitir la declaración del Dr. García de la Torre sobre la duración probable de la vida de Alfredo D. Martínez.

"7mo. La corte erró al declarar con lugar la demanda, condenando al demandado a pagar una suma que no está justificada por la prueba aportada en el juicio."

[1] Para sostener la primera proposición el apelante dice:

" . . . . Bien es verdad que el prejuicio no es una de las causas expresamente señaladas en nuestro estatuto sobre inhibición de los Jueces, pero de todas maneras traemos esta cuestión a la consideración de este alto Tribunal para que se dé cuenta de que el demandado no tuvo un juicio imparcial y que el prejuicio del Juez influyó decididamente en las conclusiones a que llegó con respecto a la prueba creyendo solamente la prueba de los demandantes y no dando crédito en absoluto a la prueba del demandado. Dice la jurisprudencia a este respecto:

" 'Aun cuando el prejuicio del Juez no constituya base para su inhibición, si se presenta la cuestión y los hechos alegados indican la existencia de dicho prejuicio, la Corte de apelaciones escudriñará cuidadosamente el record para ver que no se le haya hecho injusticia a la parte querellante.' 33 C. J. pág. 1000."

Hemos analizado los autos y como resultado de dicho análisis estamos convencidos de que no se ha cometido ninguna injusticia con el demandado.   Estamos enteramente de acuerdo con la conclusión a que llegó el juez sentenciador por virtud de los hechos y en verdad que hubiéramos encontrado más difícil, si no imposible, confirmar una sentencia a favor del demandado por sus méritos.

[2] Transcribimos el documento a que se hace mención en el segundo señalamiento de error, el cual dice:

''Número 29.

Municipio de Cabo Rojo, P. R.,<br>Oficina del Registro Civil.

Alfredo D. Martínez Barbot,
con María Luisa Silva y González.

ACTA DE MATRIMONIO

En Cabo Rojo, P. R., a las dos de la tarde del día quince de marzo de mil novecientos veinte y uno, yo, E. Romeu Ortiz, Encargado del Registro Civil, certifico, que no consta en este antecedente alguno que impida verificar la transcripción que voy en este acto a efectuar de los particulares pertinentes de una declaración jurada y certificación de haberse celebrado un matrimonio, archivadas en esta oficina y que tengo ante mí, siendo dichos particulares los siguientes: 1o. Que en Cabo Rojo, el día trece de marzo del año de mil novecientos veinte y uno, ante Francisco Montalvo, Juez Municipal, se celebró el matrimonio civil que contrajeron Alfredo D. Martínez, de veinte y cuatro años de edad, de estado soltero, de profesión agricultor, natural de Mayagüez y avecindado en la calle 'Brau' de Cabo Rojo, y María Luisa Silva y González, de veinte y dos años de edad, de estado soltera, de profesión doméstica, natural de Cabo Rojo, avecindada en la calle 'Muñoz Rivera' de Cabo Rojo. 2o. Que el contrayente Alfredo D. Martínez, es hijo legítimo de Juan C. Martínez, natural de Mayagüez, de 47 años de edad, de la raza blanca, de estado casado, de profesión agricultor, residente en Cabo Rojo, y que está vivo; y Margarita Barbot, natural de Mayagüez, de 45 años de edad, de la raza blanca, de estado casada, de profesión doméstica, residente en Cabo Rojo, y que está viva.   Que la contrayente María Luisa Silva y González, es hija legítima de Rodulfo Silva, natural de Cabo Rojo, de 50 años de edad, de la raza blanca, de estado casado, de profesión agricultor, residente en Cabo Rojo y

que está vivo; y de María La O. González, natural de Cabo Rojo, de 42 años de edad, de la raza blanca, de estado casada, de profesión doméstica, residente en Cabo Rojo, y que está viva. 4o. Que este matrimonio fué celebrado ante los testigos Ricardo Ramírez Morales, mayor de edad, de estado soltero, de profesión médico, natural de Cabo Rojo y avecindado en la calle 'Muñoz Rivera,' de Cabo Rojo; y Ernesto Pagán Rusell, mayor de edad, de estado divorciado, de profesión industrial, natural de Cabo Rojo, y avecindado en la calle 'Carro' de San Germán. Dr. E. Romeu Ortiz, Encargado del Registro Civil. Hay un sello en tinta.—CERTIFICO: Que es copia fiel y exacta de su original obrante al folio 275 tomo 9 de la sección de matrimonios de este Registro Civil a que me remito, y para que así conste a instancia de parte interesada libro la presente que firmo y sello en Cabo Rojo, P. R., a veinte de abril de mil novecientos veinte y tres.—Firmado. Dr. E. Romeu Ortiz.—Comisionado Mpal. de Beneficencia. Tiene un sello que dice: Registro Civil, Cabo Rojo, P. R.

Al ser ofrecido este documento como prueba, el abogado manifestó:

"En cuanto al *exhibit* C de los demandantes que es la pretendida certificación del matrimonio celebrado entre Alfredo Dimas Martínez y María Luisa Silva nos oponemos a su admisión por lo siguiente, porque lo único que es admisible en un tribunal de justicia en evidencia a este respecto, es una copia fiel y exacta del acta de matrimonio y no la relación que del contenido de particulares de ese acta del encargado de conservarla. La ley es que se copie el acta y entonces ponga abajo, la precedente es copia fiel y exacta del matrimonio etc., que consta al folio tal, libro tal de matrimonios de este Registro Civil. Aquí lo que se dice en Cabo Rojo, Puerto Rico, a las dos de la tarde del día 15 de marzo del 1921, yo E. Romeu Ortiz certifico, etc., es decir, de lo pertinente según él lo siguiente, y entonces oficio, esto no es la copia fiel y exacta que demanda la ley y por ese motivo nos oponemos en cuanto a esta prueba."

La resolución que ahora se impugna es la siguiente:

"La corte resuelve el asunto admitiendo el documento, es una copia del registro civil creditiva de haberse inscrito el matrimonio verificado."

El documento en conjunto, de leerse a la luz de las va-

rias fechas que en él se mencionan, se ve que no representa ser un extracto del asiento de inscripción, sino una copia íntegra del mismo. Esa inscripción practicada dos días después de la celebración del matrimonio comprende las partes esenciales de la certificación expedida, o diligenciamiento hecho por el juez municipal. El documento ofrecido como prueba es una copia certificada de esa inscripción librada como a los dos años de verificada la inscripción. No es una sinopsis subsiguiente del extracto original, sino una copia de dicha inscripción que se certifica es copia fiel de la misma.

Cualquier motivo de duda en este sentido pudo haber desaparecido mediante cierta introducción o prefacio, pero la objeción no se funda en ninguna omisión en este particular que de ningún modo apenas si podía considerarse como una cuestión tan seria que la negativa a eliminar tal prueba equivaldría a un error que pudiera servir de base a la revocación de la sentencia.

[3] El exhibit F de los demandantes es como sigue:

"National Guard of Porto Rico, Office of the Adjutant General. Address all official communications to the Adjutant General of Porto Rico.—San Juan, P. R., September 17, 1923.

*To Whom it May Concern:*

"This is to certify that:

"Mr. Alfredo D. Martínez a resident of the municipality of Cabo Rojo, Porto Rico, was appointed a First Liuetenant of Infantry in the National Guard of Porto Rico, on February 25th 1921.

"That First Lieutenant Alfredo D. Martínez, Infantry, P. R. N. G. on February 25, 1921 was assigned to Company 'C' Ist Infantry, P. R. N. G. stationed at Cabo Rojo, Porto Rico.

"That on March 17th 1922, First Liuetenant Alfredo D. Martínez, Infantry P. R. N. G. was promoted to Captain, and was assigned to command Company 'C' Ist Infantry, P. R. N. G. stationed at Cabo Rojo, P. R.

"That during the period of March 7th, 1922, to January 16th, 1923, Capt. Alfredo D. Martínez, Infantry P. R. N. G. was receiving a salary of $720.00 per year paid by the Federal Government, as Company Commander.

"That during the Annual Field Encampment of the Porto Rico

National Guard held at Arecibo from August 13th, to August 27th, 1922, both days inclusive Captain Alfredo D. Martínez, Infantry, P. R. N. G. was present at said Camp during the whole period and received the sum of $158.00, federal pay as Captain during the fifteen days field service.

"That during the time that Capt. Alfredo D. Martínez was serving as officer of the Porto Rico National Guard, from February 25th, 1921, to January 16th, 1923, date on which he was enjoying good health and never during that time a silk leave of absence was granted to him by this office.

"That the services rendered by Mr. Alfredo D. Martínez as an officer of the Porto Rico National Guard were most reliable and he was considered a bright and a very efficient officer.

"That Company 'C' 1st. Infantry, P. R. N. G. stationed at Cabo Rojo, Porto Rico, under the command of Capt. Alfredo D. Martínez, Inf. P. R. N. G. was considered at the Camp of Instruction of the Porto Rico National Guard held in Arecibo from August 13th to August 27th the best company of the Porto Rico National Guard, and as a reward for the good work performed in competition drills by this organization a silver cup was presented to Capt. Martínez.

"That on the night of January 16th 1923, the death of Capt. Alfredo D. Martínez, Inf. P. R. N. G. was notified to this office by First Lieutenant William H. Montalvo, Infantry P. R. N. G., and at that time was a Captain of the National Guard of Porto Rico and was commanding Company 'C' 295th Infantry P. R. N. G.

"That in accordance with National Guard Regulations an officer has to be physically examined every year and from the records of this office it appears that Capt. Alfredo D. Martínez, Infantry, P. R. N. G. was examined on the years 1920-1921-1922 and that said records show he was in good health and his body in good condition.

"(Firmado)      John A. Wilson — The Adjutant General."

Se hizo objeción a la presentación de esta certificación por los siguientes fundamentos:

"La mejor prueba de que un individuo ha sido nombrado para un cargo es su nombramiento, la comisión que lo ha expedido, el Gobernador, la autoridad capacitada para ello, y autorizada para ello, y esa es la prueba que debe venir aquí, no la certificación en cuanto al nombramiento. Además esta certificación se pone a hablar de que disfrutaba de buena salud, eso no es propio para que el Adjutant General lo ponga en una certificación puesto que no está en sus deberes, ni él es médico, ni se ha probado aquí que lo sea para

certificar que este hombre estuviera en buena salud. Aparte de eso esto no está autenticado, ni la firma del señor Wilson, que de acuerdo con la ley quisiera que el compañero señalara algo sobre el particular. La Corte está justamente obligada a reconocer la firma de un funcionario a menos que la ley no determine. La ley según S. S. lo sabe dice que la Corte está obligada a conocer los actos de los departamentos del Gobierno, pero éste es un negocio particular y a menos que la ley, no dispusiera expresamente que la Corte tomaba conocimiento judicial de la firma de este funcionario, la Corte no puede admitir este documento, y por otro lado aquí se habla de un tal Alfredo D. Martínez, y aquí estamos hablando de Alfredo Dimas Martínez y mientras no se identifique esa persona como el interfecto en este caso nos oponemos.''

Las comisiones firmadas por el Gobernador de Puerto Rico nombrando a Alfredo D. Martínez primer teniente y luego capitán de la Guardia Nacional fueron ofrecidos como prueba en unión de la certificación de los servicios prestados, *supra,* y admitidas sin objeción alguna.

El artículo 69 de la Ley de Evidencia prescribe que, entre otros, los siguientes documentos ''podrán probarse como sigue'':

''5. Los actos de una corporación municipal de Puerto Rico, o de una junta o departamento de la misma, mediante copia, certificada por el correspondiente archivero, o mediante un libro impreso, publicado por autoridad de dicha corporación.

''6. Los documentos de cualquiera otra clase en Puerto Rico, mediante el original o una copia, certificada por el guardador legal de aquél.

''7. Los documentos de cualquiera otra clase en un Estado de la Unión, mediante el original o una copia, certificada por el guardador legal de aquél, acompañada de la certificación del Secretario de Estado, un juez de la Corte Suprema, superior, o del condado, o alcalde de una ciudad de dicho Estado, haciendo constar que la copia está certificada en debida forma por el funcionario encargado oficialmente de la custodia del original.

''8. Los documentos de cualquiera otra clase en país extranjero, mediante el original, o una copia certificada por el guardador legal de aquél, bajo su sello, si lo tuviere, acompañada de una certificación del ministro o embajador, o un cónsul, vice-cónsul, o agente con-

sular de los Estados Unidos en dicho país extranjero, atestando que es documento válido y existente en dicho país, y que la copia está certificada en debida forma por el funcionario encargado de la custodia del original.

''9. Los documentos en los departamentos del Gobierno de los Estados Unidos, mediante el certificado del guardador legal de los mismos.''

De modo que la Legislatura parece haber distinguido entre una certificación y una copia certificada y haber significado esta última cuando se trataba de excluir un extracto o resumen. Quizás si tuvo en cuenta la rama militar del servicio público como comprendida en el Departamento de la Guerra.

Pero sea esto como fuere, tal certificado de servicio militar como el que ahora se considera sería admisible en principio aun a falta de cualquier disposición legislativa local.

''En primer lugar, virtualmente no es más que una copia certificada, en resumen, del record regular de servicios llevado en el departamento; el record séría admisible por virtud del principio contenido en la sección 1639, *ante*, y la copia certificada por el de la sección 1677, *post*. Además, se hace con el fin específico de ser presentada y usada; y el impedir su uso en las cortes es destruir su objeto en parte. En tercer lugar, solicitar cualquier otra cosa en sustitución es impracticable; pues todos los funcionarios que intervinieron al hacer el record no es posible que puedan conseguirse como testigos; y el jefe de un departamento federal de records no puede virtualmente conseguirse para prestar declaración *viva voce;* además, él personalmente no sabe nada fuera del record. Excluir el certificado es prácticamente excluir toda prueba sobre la cuestion.

''En vista del hecho de que el Ejército y Marina de los Estados Unidos contenía más de cuatro millones de personas durante la Gran Guerra, es esencial que la admisibilidad de certificados de servicios, bajo cualquier nombre, debe ser reconocida. Algunos estatutos así lo han prescrito expresamente. Las cortes, sin embargo, a veces han mostrado una actitud estricta según la ley común, que no solamente injuria al sentido común, sino que tiene que causar resentimiento en todos aquellos que estiman su record de servicio militar. La mente civil necesita aquí alguna liberalidad.'' Wigmore sobre Evidencia, pág. 539 y siguientes, Sec. 1675a.

[4] La doctrina ortodoxa sobre conocimiento judicial descansa esencialmente en la notoriedad. El principio en tanto es de aplicación aquí, afecta a la identidad del individuo que certifica como actual interesado del cargo, más que a la autenticidad de la firma. La autenticidad de la última se asume simplemente como cuestión de conveniencia práctica. El proceso no envuelve el reconocimiento de un hecho notorio conocido judicialmente como tal hecho, sino una presunción fundada en la probabilidad inherente de autenticidad, en lo remoto de la posibilidad de falsificación y en la facilidad con que podía determinarse y presentarse una tentativa de fraude o engaño a la corte.

El lenguaje liberal de nuestra ley local de evidencia no debiera ser interpretado rigurosamente. Meramente indica las líneas generales en las cuales puede ejercitarse la facultad del conocimiento judicial. No limita la esfera o alcance de esa facultad que es inherente en toda corte de justicia, sino que marca el rumbo a un amplio campo de utilidad en el cual esa facultad puede ser ejercitada a gusto como ayuda eficaz a la simplificación del procedimiento y a la administración práctica de la justicia substancial.

Una exposición clara y comprensiva de esta materia puede hallarse en el tomo 4 de Wigmore, sec. 2131, p. 549 (f), secciones 2161–2169, 2566, 2571, 2576 y 2583.

De todos modos, cualquier facultad estatutoria para tomar conocimiento judicial que pueda ser exigida al tratar de documentos comprendidos en la subdivisión 9, sección 69 de la Ley de Evidencia, se infiere necesariamente del claro precepto de la ley misma, especialmente de interpretarse a la luz de la significativa omisión de toda referencia a la certificación adicional especificada en varias de las anteriores subdivisiones arriba citadas.

La única relación lógica de la certificación misma era en cuanto a la cuantía de los daños y perjuicios y el único efecto legal que pudo haber tenido en la adjudicación que ha de hacerse no hubiera tendido a aumentar su cuantía. Consi-

derada en relación con todas las demás pruebas sobre la cuestión de la capacidad para ganar, este documento era, si acaso, más favorable al demandado que a la demandante.

[5] Como ya se ha indicado, las comisiones originales de teniente y capitán de la Guardia Nacional estaban ante la corte.

El mismo médico que había hecho los exámenes oficiales mencionados en la certificación declaró ampliamente y en particular respecto a la buena salud y excelente condición física del capitán.

Tanto la esposa como el padre, si bien admitían la falta de información exacta acerca de la cantidad precisa recibida por el capitán Martínez en compensación a sus servicios como miembro de la Guardia Nacional, calcularon las rentas obtenidas por este concepto sólo aproximadamente a razón de $100 mensuales. Esta prueba no fué contradicha excepto en cuanto a que las sumas especificadas en la certificación parecen indicar un tipo algo inferior durante el período de diez meses, más o menos, a que la misma se contrae.

Uno de los testigos a que se acaba de hacer referencia, también dijo que el capitán Martínez había sido recomendado para un ascenso a comandante y esta manifestación tampoco fué contradicha, a menos que se le tenga como negada en cierto modo por el silencio de la certificación sobre este particular.

[6] Desde el punto de vista del valor probatorio la comisión de capitán en el cuerpo de Reserva de oficiales es aún más claramente un factor que puede omitirse como elemento en la medida de los daños y perjuicios.

[7] Al ofrecerse este documento, no se pretendió o alegó por el abogado del demandante que Martínez recibía, había recibido, o probablemente recibiría en cierta fecha venidera algún sueldo por virtud de tal nombramiento. La teoría parece haber sido que podría considerarse que la comisión tiene alguna relación, más o menos remota, con la cuestión general de la capacidad para poder percibir un salario.

Considerada como un título más o menos honorario y como circunstancia adicional indicativa del rango militar y reputación de Martínez en la fecha de su muerte, el documento tal vez merecía alguna consideración, por pequeña que fuera, en este sentido. No se sugiere por el abogado del apelante, ni existe nada en los autos que indique que el juez sentenciador entendió mal o dejó de apreciar de algún modo su valor probatorio. De la prueba, en conjunto, analizada a la luz de los hechos probados y conclusiones de derecho a que llegó el juez sentenciador, resulta enteramente claro que la exclusión del documento no hubiera afectado al resultado o a la cuantía de los daños y perjuicios realmente concedidos, de algún modo o en cualquier límite.

Revocar la deliberada sentencia de una corte inferior por los méritos de un caso excepcionalmente claro por meros errores técnicos en la admisión de prueba acumulativa que sólo afectan a la cuantía de los daños y perjuicios, cuando aparece fuera de duda razonable que la exclusión de tal prueba no podía haber afectado al resultado, equivaldría a un fracaso de la justicia.

[8] El razonamiento contenido en la quinta proposición enunciada en el señalamiento no pone en duda la doctrina sentada en los casos de *Soriano* v. *Rexach,* 23 D.P.R. 573; *Morales* v. *Landrau,* 15 D.P.R. 782, y *Casanovas & Co.* v. *Ramírez,* 25 D.P.R. 625. La contención es que debe regir un principio distinto en una acción establecida de acuerdo con el artículo 61 del Código de Enjuiciamiento Civil. La única autoridad citada, sin embargo, en relación con esto, es 8 Rulling Case Law, página 761, que en manera alguna es concluyente sobre el punto aquí presentado.

[9] El apelante también manifiesta que en la demanda no se dice si los demandantes fueron instituídos herederos en el testamento o alegaban tal condición por virtud de mandamiento judicial. A esto sigue la contención de que a falta de cualquier alegación sobre los particulares enumerados en la sección 19 de la Ley de Procedimientos Legales

Especiales, la prueba del carácter de heredero debió haber sido excluída. En relación con esto se dice que tal prueba fué admitida no obstante la repetida protesta del demandado y que se tomaron excepciones a tales resoluciones. Pero no se hace referencia a alguna página o parte de la transcripción, y como hasta ahora se ha indicado con frecuencia en casos anteriores, esta omisión sin más sería bastante para estar justificados en no considerar la cuestión que de tal modo se trata de levantar.

[10] Sin embargo, toda vez que ya hemos examinado los autos con otro fin, de paso puede hacerse mención de los únicos dos incidentes a que se nos ha llamado la atención y que podrían considerarse como que prestan algún apoyo a la teoría del apelante.

Mientras declaraba el testigo Plinio Castro ocurrió el siguiente incidente:

"P.—¿Lo conocía Ud. desde pequeño a Alfredo Dimas Martínez? R.—Desde pequeño. P.—¿Sabe Ud. si él es vivo o muerto? R.—Muerto. P.—¿Sabe Ud. si él dejó algún hijo? R.—Uno. P.—¿Cómo se llama? R.—Se llama Alfredo Juan. P.—¿Sabe Ud. si él procreó algún otro hijo natural o algún otro hijo legítimo? R.—Ninguno. P.—¿Ni natural reconocido? R.—Ninguno.—Demandado: Me voy a oponer a esa pregunta, y me voy a oponer por los siguientes fundamentos. Juez: Ya está contestada, señor Letrado. Demandado: Entonces pedimos la eliminación, solamente por el fundamento, S. S. la puede admitir pero es para que la Corte vea cuál es la idea. Juez: La Corte admite la pregunta y contestación para darle el valor que en sí tenga en el conjunto de toda la prueba. Demandado: Tomamos excepción fundándonos que aquí el derecho previo para fundamentar esa acción se tiene que fundamentar en el carácter previo de heredero de la persona finada, y aquí no se ha presentado ningún testamento ni declaratoria de heredero que él otorgara sobre esto como para probar este extremo. En este caso se trata de presentar esta prueba oral para que la Corte hoy la juzgue, por esas razones tomamos nuestra excepción. Juez: La Corte la admite."

También mientras declaraba Juan C. Martínez, padre del capitán fallecido, vemos lo siguiente:

"P.—¿Su hijo era casado? · R.—Mi hijò era casado con la señora María Luisa Silva, la presente. P.—¿Tuvieron algún hijo? R.—. Del matrimonio tuvo un pequeño niño que tenía como siete meses cuando el asesinato de mi hijo. P.—¿Vive ese hijo? R.—Sí, señor, vive. P.—¿Es vivo? R. —Sí, señor, vive, está aquí en Mayagüez. P.—¿Vive con Ud. y la señora madre? R.—Vive conmigo y la señora madre. P.—¿Su hijo vivió siempre con Ud.? R.—Siempre, todos mis hijos viven conmigo excepto la mujer. P.—¿Ud. conoció o le consta si su hijo tuvo algún otro hijo natural o legitimado, o natural reconocido? R.—No, señor. Demandado: Me opongo a la pregunta. Juez: La Corte la admite. Demandado: Tomo excepción."

En ambos casos la objeción se hizo demasiado tarde. En ninguno se hizo referencia a alguna cuestión de incongruencia entre la demanda y la prueba testifical, ni mucho menos se manifestó que el demandado fué sorprendido, o en forma alguna inducido a error en su perjuicio. Claramente que tales cuestiones no pueden ser levantadas por primera vez en apelación.

[11] El error, si alguno hubo, al admitir la declaración del Dr. García de la Torre fué debido al demandado y no puede alegarse ahora como fundamento para la revocación.

[12] Todo el razonamiento bajo la proposición séptima sometida por el apelante está contenido en el siguiente párrafo:

"Séptimo error.—No habiéndose probado el matrimonio de la demandante con Alfredo D. Martínez, y la cualidad esencial de herederos del fenecido Alfredo D. Martínez y en virtud de todos los errores señalados anteriormente la Corte erró al declarar con lugar la demanda condenando al demandado a pagar la suma consignada en la sentencia. Por otro lado, dicha suma es completamente excesiva, infringiendo la Corte la regla que preside la determinación de la cantidad de la indemnización, no tomando en cuenta los recursos del demandado, los ingresos con que contribuía el fenecido para el sostenimiento de su esposa e hijo y además el principio de que cuando se trata de un menor la indemnización debe fijarse teniendo en cuenta el tiempo que falta para llegar a la mayoría de edad que es el tiempo en que el padre viene obligado a alimentarlo y sostenerlo. Véase 8 R.C.L. pág. 833."

·· Aun cuando las ·premisas envueltas tuvieran algún fundamento en realidad, que aparentemente no tienen, tal generalidad en la exposición y conclusión, sin un razonamiento o referencia a las partes pertinentes de la transcripción no impondrían a esta corte ninguna obligación de escudriñar los autos en busca de datos con el fin de basar en ellos la revocación de la sentencia apelada.

*Debe confirmarse la sentencia.*